**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. GONCI, JR.; SCARENTERTAINMENT LLC d/b/a BRIGHTON ASYLUM; BRIGHTON STUDIOS LLC; MORSEMERE COMMUNITY CHURCH; CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST, INC.; JOHN DOES 1–10; and DOE CORPORATIONS 1–10,<br><br>Defendants. | Civil Action No. 2:26-cv-________<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiff JANE DOE ("Plaintiff"), for her Complaint against Defendants, avers upon personal knowledge as to her own acts and experiences and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. JANE DOE's public mailing address for purposes of L. Civ. R. 10.1(a) is P.O. Box 2005, River Vale, NJ 07675. Defendants' addresses are: RICHARD A. GONCI, JR., 118 14th Street, Cresskill, NJ 07626; SCARENTERTAINMENT LLC d/b/a BRIGHTON ASYLUM, 2 Brighton Avenue, Passaic, NJ 07055; BRIGHTON STUDIOS LLC, 35 Meadow Street, Suite 201, Brooklyn, NY 11206 (with a reported registered agent address at 306 Francis Street, Teaneck, NJ 07666); MORSEMERE COMMUNITY CHURCH, 930 Linden Avenue, Ridgefield, NJ 07657;

and CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST, INC., 918 South Rolling Road, Catonsville, MD 21228. JANE DOE seeks leave to proceed under a pseudonym because public identification would expose her identity as a trafficking victim and the person depicted in sexually explicit recordings, revealing sensitive psychiatric, sexual, and immigration information. She concurrently seeks leave to proceed in forma pauperis and appropriate protection of her true identity and residential address.

## NATURE OF THE ACTION

2. This is an action by a frail, impoverished, and severely impaired Asian woman against RICHARD A. GONCI, JR., a twice-married, successful white male business owner — the creator and operator of Defendant SCARENTERTAINMENT LLC d/b/a BRIGHTON ASYLUM ("BRIGHTON ASYLUM") — who, having previously been arrested and charged with endangering the welfare of a child, held her in personal servitude for approximately six years — subjecting her to ableist humiliation by calling her "crazy" and "LITERALLY insane," and to racist and misogynistic degradation by reducing her to the role he disparaged as his "Asian whore." To procure commercial sex acts through force, fraud, and coercion, he systematically exploited her dependence upon transportation, cash, and offers of his own labor; manufactured false promises of romance; and weaponized her fear of arrest, incarceration, and deportation. When she resisted, he threatened police and immigration intervention. When she objected to violence, he disregarded her refusal. He recorded sexually explicit videos of her without consent, including on his business premises, both surreptitiously and despite her explicit commands to STOP. His conduct left her with cervical-spine injuries, recurring debilitating headaches, and persistent gynecological complications, including high-risk HPV. His intimidation continues today, through his agents' 2025 ICE subpoena and their retention of her sensitive immigration and identity documents despite her objections. This action also joins BRIGHTON STUDIOS LLC ("BRIGHTON STUDIOS")

and the church institutions, MORSEMERE COMMUNITY CHURCH and the CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST, INC., whose conduct and failures provided the premises, access, and institutional protection that enabled the abuse.

## SUMMARY OF THE ACTION

3. JANE DOE was sex trafficked while she was a congregant of Defendant MORSEMERE COMMUNITY CHURCH ("MORSEMERE"), where she had sought spiritual refuge following psychiatric hospitalization. In 2016, she suffered from severe psychiatric illness and anorexia with cachexia, weighed approximately sixty pounds, depended upon others for transportation, and feared deportation. MORSEMERE's installed pastor, Rev. Hyo-Jung Kim, who also served on the Board of Directors of Defendant CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST, INC. (the "CONFERENCE"), entrusted her transportation home from Sunday worship to Defendant RICHARD A. GONCI, JR. ("GONCI"), the Church's longtime Music Director.

4. GONCI had previously been arrested and charged with endangering the welfare of an eleven-year-old girl, after being accused of kissing her — at a time when he worked as a piano teacher, in a position of trust and authority over children. MORSEMERE's governing council had investigated that incident and voted to retain him, according to information subsequently provided to JANE DOE by its Council President. Yet the Church entrusted a severely vulnerable congregant to GONCI without warning her of the sexual misconduct of which he had been accused, or establishing any protective safeguards. JANE DOE holds MORSEMERE and the CONFERENCE responsible for the failures of care, warning, and oversight set forth below.

5. GONCI used his church-conferred access to discover JANE DOE's vulnerabilities and begin securing sexual access. During their initial ride, he volunteered intimate details of his

infidelity and impending divorce, disclosing that his girlfriend was an employee of BRIGHTON ASYLUM, and later became his wife. His unsolicited disclosures encouraged JANE DOE to confide her psychiatric illnesses, incarceration history, and fear of deportation. Shortly afterward, he sent her an unsolicited sexually explicit image appearing to depict two underage girls engaged in anal intercourse, accompanied by the message, "I only like girls who do this!" Shocked and disturbed, she immediately deleted it. However, JANE DOE failed to see that GONCI could be a dangerous sexual predator, because the pastor had recommended him to her and she had known him since childhood. She did not know he had been arrested and charged with endangering the welfare of a child, because no one from MORSEMERE or the CONFERENCE ever told her. Had they told her, none of what followed over the next six years would have happened, and she would not have been harmed.

6. GONCI thereafter persistently solicited anal intercourse despite JANE DOE's repeated statements that she had never engaged in sodomy. He bombarded her with text messages soliciting anal sex and dangled promises of romance and a relationship, pressing her until, under his persistent entreaty, she said she would try it — a statement about an act in the abstract, which was never consent to any encounter, to any place, or to being recorded. In September 2016, GONCI showed up to JANE DOE's house in the middle of the week and made JANE DOE take an oral HIV screening test, which both of them took by mouth swab; both results were negative. He used the negative results to assure her that he was totally safe, that unprotected intercourse was safe, and that he never had to wear a condom — even though the test screened only for HIV and did not screen for other sexually transmitted infections. GONCI combined sexual pressure, promises of

affection, and misleading assurances of sexual safety to overcome JANE DOE's hesitation and resistance.

7. On October 19, 2016, ICE arrested JANE DOE and released her under federal supervision requiring a GPS ankle monitor. Four days later, GONCI was entrusted with driving her home from MORSEMERE. She expected a ride home, as on all the other times — not a motel, and not sexual intercourse. That diverted ride was the first time GONCI had sex with JANE DOE. Without her consent, GONCI diverted the ride to a motel in Fort Lee, instructed her to wait, and refused her repeated pleas to take her home. Her ankle monitor required regular charging and routinely emitted alerts followed by telephone calls from ICE officers. JANE DOE explained that she needed to return home to comply with federal supervision and feared renewed detention. GONCI knew she was stranded, could not get home on her own, and faced detention if she failed to respond to ICE. He nevertheless refused to take her home unless she submitted to unprotected vaginal and anal intercourse. On or about November 20, 2016, he repeated the unauthorized motel diversion and again disregarded her requests to return home. GONCI turned transportation entrusted to him by the Church into leverage for sexual submission, making JANE DOE choose between yielding to his sexual demands and remaining stranded under the threat of immigration consequences. The transportation he withheld was the thing of value he conditioned upon the sexual acts, while her dependence and fear of detention supplied the means of coercion.

8. Following JANE DOE's release from county jail in August 2017, GONCI maintained sexual access through cash payments, transportation, conditional assistance, violence, and threats. Shortly after her release, he offered her $200 in connection with anal intercourse and refused to take the money back when she tried to return it; he repeatedly gave her cash he called "gas money" or "the arrangement," and arranged paid transportation to bring her to his residences and business. When JANE DOE objected to being treated as an Asian whore or resisted accepting

money, GONCI demanded secrecy. He also instructed her to delete communications. On February 26, 2021, he conditioned approximately six hours of his own moving assistance upon sexual access; during Hurricane Ida, he conditioned emergency assistance upon anal intercourse. GONCI exploited her need for transportation, financial security, and practical assistance while threatening police complaints, harassment and extortion accusations, restraining orders, and immigration intervention when she resisted or sought to end contact. He used the threat of legal consequences to make resistance appear more dangerous than submission.

9. GONCI reinforced that coercive pattern through strangulation, neck compression, slapping, hair-pulling, physical restraint, and painful sexual penetration despite JANE DOE's objections. He degraded her as his "Asian whore," called her "crazy" and "LITERALLY insane," and dismissed her resistance as consensual sexual roleplay. His threats exploited circumstances he knew firsthand: JANE DOE's psychiatric disabilities, prior incarceration, financial insecurity, and acute fear of deportation. She repeatedly objected to the violence and demanded that particular acts STOP. GONCI acknowledged under oath that she "did not react well to it at all afterwards," yet continued the same conduct. Her objections and pleas to STOP were ignored entirely. She was powerless to stop him — from filming her, from unprotected penetration, and from threatening to call the police, to seek baseless domestic-violence restraining orders, and to report her to immigration authorities.

10. The physical harm outlasted the sexual exploitation. JANE DOE sustained neck and cervical-spine injuries and suffers from recurring debilitating headaches requiring multiple medications. She also continues to test positive for high-risk human papillomavirus ("HPV") and has undergone repeated painful and invasive gynecological procedures. She attributes these injuries and complications to GONCI's violent sexual conduct, repeated unprotected intercourse,

and misrepresentations concerning sexual-health risks, as addressed in the medical and expert evidence.

11. GONCI owns and controls BRIGHTON ASYLUM. He used BRIGHTON ASYLUM's commercial premises at 2 Brighton Avenue, Passaic, New Jersey, to isolate JANE DOE and carry out sexual acts away from public observation. He brought her into a bed-furnished escape room known as "Escape Room 1408" and a commercial storage area, controlled access, and disabled surveillance cameras while continuing to conduct business operations. BRIGHTON STUDIOS owned the premises and received rental income from premises where BRIGHTON ASYLUM let the man who owned and controlled it have sex on a company bed, on company premises, and film the sex videos on his cellular telephone — the number BRIGHTON ASYLUM published as its business contact number. In one such video, recorded in the BRIGHTON ASYLUM storage unit, JANE DOE exclaimed, "you're f--king filming this," and GONCI answered, "Don't worry I only film good little asian whores."

12. GONCI secretly recorded sexually explicit videos of JANE DOE and continued filming on other occasions despite her unequivocal commands to STOP. His own recordings capture her demanding, "STOP filming me Jesus Christ," and protesting that she did not want to be seen. He disregarded her objections and assured her that the recordings would remain private. After JANE DOE commenced her state-court civil action, the recordings were transmitted through physical media, litigation vendors, and electronic repositories. During disputed deposition proceedings, defense counsel demanded that she watch the sexually explicit material and declared, "Drop your case. That's your only real choice because we're going through them today." JANE

DOE challenges specified disclosures as unauthorized and as a means of humiliating and pressuring her to abandon her claims.

13. The intimidation continued through the use of JANE DOE's immigration vulnerability. Despite the parties' October 2021 written agreement restricting contact with immigration authorities, GONCI's counsel served a subpoena upon ICE in October 2025 seeking her immigration records. Defendants subsequently obtained and retained unredacted copies of her Permanent Resident Card and other sensitive identifying documents through contested discovery disclosures, despite her demands that they be protected and clawed back. JANE DOE seeks damages and appropriate equitable relief, including restrictions on unauthorized use and disclosure, an accounting of recipients, and the return, segregation, redaction, or destruction of disputed copies as permitted by law.

14. JANE DOE brings this action under the civil-remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, the federal statute prohibiting the disclosure of intimate visual depictions, 15 U.S.C. § 6851, and applicable supplemental New Jersey statutory and common-law claims. She seeks to hold GONCI responsible for his direct conduct; BRIGHTON ASYLUM and BRIGHTON STUDIOS for their respective actionable participation, knowledge, and financial benefit; and MORSEMERE and the CONFERENCE for their independent breaches of duties of care and protection. She demands compensatory and other legally available damages, appropriate equitable relief, protection against further unauthorized

disclosure of her sexually explicit recordings and identifying documents, and trial by jury on all issues so triable.

## THE PARTIES

15. Plaintiff JANE DOE ("JANE DOE") is a disabled Asian woman residing in Bergen County, New Jersey. She was born in South Korea, immigrated to the United States as a child, and is a lawful permanent resident currently in removal proceedings. Her psychiatric and physical disabilities predated the events alleged herein. Plaintiff seeks leave to proceed under a pseudonym and to submit her identifying information under seal.

16. Defendant RICHARD A. GONCI, JR. ("GONCI") is an adult individual domiciled in Cresskill, Bergen County, New Jersey. For approximately eighteen years, until December 4, 2016, MORSEMERE COMMUNITY CHURCH employed him as its organist and Music Director. He also served on its Church Council.

17. GONCI is the sole owner, chief executive officer, president, and managing member of SCARENTERTAINMENT, LLC d/b/a BRIGHTON ASYLUM. He directed its business operations and employees and controlled its commercial rooms, interior locks, surveillance cameras, security systems, admission passes, and business communications, including those used in connection with the conduct alleged herein.

18. Defendant SCARENTERTAINMENT, LLC d/b/a BRIGHTON ASYLUM ("BRIGHTON ASYLUM") is a New Jersey limited liability company formed on January 19, 2009, with its principal place of business at 2 Brighton Avenue, Passaic, New Jersey 07055. It operates

a commercial haunted attraction and escape-room complex open to the paying public, including the hotel-themed Escape Room 1408.

19. Defendant BRIGHTON STUDIOS LLC ("BRIGHTON STUDIOS") is a New Jersey limited liability company formed on September 15, 2016. It acquired title to the property at 2-20 Brighton Avenue, Passaic, New Jersey 07055 (the "Premises"), on November 7, 2016, and leased commercial space there to BRIGHTON ASYLUM. BRIGHTON STUDIOS received rent from that tenancy and retained contractual rights of entry and inspection and responsibilities for roof and structural maintenance under the leases described below.

20. Defendant MORSEMERE COMMUNITY CHURCH ("MORSEMERE") is a religious congregation located at 930 Linden Avenue, Ridgefield, New Jersey 07657 and, upon information and belief, a New Jersey nonprofit corporation. During the relevant period in 2016, MORSEMERE employed GONCI and acted through its Pastor, Rev. Hyo-Jung Kim, and Church Council concerning his employment and church assignments, including the assignment that he drive Plaintiff home from worship.

21. Defendant CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST, INC. ("CENTRAL ATLANTIC CONFERENCE") is a regional religious nonprofit corporation registered in New Jersey and headquartered at 918 South Rolling Road, Catonsville, Maryland 21228. Through its New Jersey Association, it participated in pastoral placement and installation and administered ministerial standing and fitness-for-ministry functions. Rev. Hyo-Jung Kim served on its Board of Directors from 2010 through 2016, including while serving as MORSEMERE's Pastor beginning in September 2015. Its alleged notice, authority, and conduct concerning Plaintiff are described below.

22. Defendants JOHN DOES 1-10 and DOE CORPORATIONS 1-10 are presently unidentified individuals and entities alleged to have participated in the conduct described herein,

including the unauthorized disclosure of Plaintiff's intimate visual depictions and the unlawful acquisition or retention of her immigration and identification information. These designations exclude courts, court staff, and judicial officers. Plaintiff will seek leave to substitute the responsible parties' true names when their identities are ascertained.

## JURISDICTION AND VENUE

23. This Court has original federal-question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's civil claims under 18 U.S.C. § 1595(a), predicated on violations of Chapter 77, including 18 U.S.C. §§ 1591, 1592, and 1594, and over Plaintiff's claim under 15 U.S.C. § 6851 for the nonconsensual disclosure of sexually explicit recordings. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's New Jersey state-law claims because they arise from the same course of church entrustment, recruitment, transportation, coercive sexual exploitation, nonconsensual recording, disclosure, and retaliation, and form part of the same case or controversy under Article III of the United States Constitution.

24. This Court has personal jurisdiction over GONCI because he is domiciled in New Jersey, and over BRIGHTON ASYLUM and BRIGHTON STUDIOS because they are New Jersey limited liability companies. MORSEMERE COMMUNITY CHURCH operates in New Jersey, employed GONCI there, and committed the acts and omissions giving rise to Plaintiff's claims in this State. CENTRAL ATLANTIC CONFERENCE, through its New Jersey Association, purposefully directed pastoral placement, Rev. Hyo-Jung Kim's May 1, 2016 installation, ministerial-standing oversight, and its August 2023 response to Plaintiff's report toward a New Jersey congregation and resident. Plaintiff's claims against the Church Defendants arise out of or relate to those New Jersey activities.

25. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here. Those events

include church-arranged transportation in Ridgefield; sexual assaults in Fort Lee, New Milford, and Closter; sex trafficking and nonconsensual filming at BRIGHTON ASYLUM in Passaic; and subsequent disclosures and immigration-related conduct in Bergen County and Newark. Allocation to the Newark Vicinage is appropriate under L. Civ. R. 40.1(a), given the location of the underlying events and the parties' connections to Bergen and Passaic Counties.

26. The trafficking, recording, and disclosure conduct occurred in or affected interstate commerce and used means and facilities of interstate commerce. GONCI used cellular telephones, text messaging, and email to recruit, summon, and coerce Plaintiff, and arranged and funded transportation through Uber, Lyft, and electronic payment networks. The conduct occurred in part at a commercial motel serving interstate travelers and at BRIGHTON ASYLUM, which advertised online and attracted customers from other states. The sexually explicit recordings were subsequently transmitted or made accessible through FedEx, email, and online services, including Veritext's portal, Microsoft SharePoint, and Dropbox.

## RELATED STATE ACTION; NO PRECLUSION, ESTOPPEL, OR ABSTENTION BAR

27. JANE DOE is the plaintiff, under her true name, in an action pending since August 28, 2023 in the Superior Court of New Jersey, Law Division, Bergen County, against GONCI and BRIGHTON ASYLUM concerning a discrete August 28, 2021 incident (the "State Action"), in which those defendants assert a counterclaim for malicious abuse of process. The State Action is scheduled for trial. The full state caption, docket number, and trial date are stated in Plaintiff's Sealed Certification of Related State Court Action filed concurrently under seal. BRIGHTON STUDIOS and the Church Defendants have never been parties to the State Action.

28. GONCI and BRIGHTON ASYLUM opposed JANE DOE's June 4, 2025 motion to add trafficking and recording claims, arguing that those claims did not relate back to the State Action pleading; by Order dated December 16, 2025, the state court denied leave "at this time,"

finding that the proposed allegations did not appear to relate to the initial complaint, and it denied a further application on May 11, 2026. Neither ruling reached the merits or was entered with prejudice, and no final judgment has been entered. The State Action remains pending and trial-scheduled; Plaintiff does not ask this Court to stay or interfere with that trial unless the Court enters an order coordinating or managing the two actions.

29. Neither claim preclusion nor the entire controversy doctrine (N.J. Ct. R. 4:30A) bars this action. In the State Action, GONCI and BRIGHTON ASYLUM opposed relation-back of trafficking and recording claims, and the state court denied leave to amend on that basis without entering final judgment on the merits. Having taken that position, they should be estopped to treat this action as the same claim precluded by the State Action. Counts V, XII, and XIII also rest on conduct in and after October 2025. JANE DOE seeks no review of any state-court judgment, no abstention of this action in favor of the State Action, no reassertion of the State Action claims, and no duplicate recovery.

## FACTUAL ALLEGATIONS

### I. MORSEMERE COMMUNITY CHURCH and CENTRAL ATLANTIC CONFERENCE Knew of GONCI's 2001 Arrest and Placed a 65-Pound, Psychiatrically Disabled Congregant Alone in His Car

30. JANE DOE is psychiatrically disabled, speaks English as a second language, and is not a U.S. citizen. In February 2016 she was hospitalized for acute psychiatric symptoms and severe anorexia nervosa with cachexia at approximately 65 pounds. By decision dated January 28, 2022, a Social Security Administrative Law Judge found her disabled effective January 1, 2019 due to bipolar and mood disorders, ADHD, OCD, and a history of severe anorexia, with marked limitations in adapting or managing herself. As a person who is not a U.S. citizen under ICE

supervision, she feared that any police report or court accusation would lead to ICE detention. GONCI knew all of this and wrote that she had looked like "DEATH at that weight."

31. The New Jersey Victims of Crime Compensation Office has recognized JANE DOE as a crime victim, approving two compensation claims and entering orders of payment on April 28, 2022, November 19, 2025, and March 13, 2026, the latter following her July 23, 2025 human-trafficking application.

32. On February 19, 2001, The Record (Hackensack) published on Page 3 an article headlined "Piano teacher charged with kissing girl, 11," reporting that police had arrested GONCI, then 25 and a private piano instructor, on a third-degree charge of endangering the welfare of a child after he isolated and kissed an eleven-year-old girl on the mouth in a school hallway during the January 19, 2001 regional band auditions at River Dell High School for which he had been hired as accompanist, that the girl "had known him for years," and that he was released on $2,500 bail. JANE DOE does not allege a conviction. Asked about the arrest at his February 3, 2026 deposition, GONCI refused to answer on counsel's instruction, stating only, "I have no conviction history" (Gonci Dep. Vol. I 182:20–183:4, 184:11–16, 189:7–17).

33. On June 4, 2023, MORSEMERE COMMUNITY CHURCH's Council President, Lauren Maehrlein, told JANE DOE that the Council had learned of and investigated the 2001 arrest at the time, convened Council meetings on whether to terminate GONCI, and voted to retain him as Music Director; JANE DOE memorialized that account in writing on June 12, 2023. Through that investigation, MORSEMERE COMMUNITY CHURCH acquired actual knowledge that GONCI had used a music-related position of trust to isolate a vulnerable female and cross sexual boundaries when unmonitored. It nonetheless imposed no restriction on his one-on-one contact with or transport of vulnerable congregants and no monitoring protocol, and it continued to promote his concerts at the church in the same newspaper that had reported his arrest, including

on October 11, 2001 and November 8, 2005; Rev. Kim likewise advertised her pastorate in The Record on August 18 and November 10, 2016, while GONCI was driving JANE DOE home.

34. In March 2016, Rev. Kim met with JANE DOE in her pastoral capacity and learned that she had severe psychiatric disabilities, was under federal immigration supervision, and had no car or ability to drive; she was visibly emaciated at approximately 65 pounds. Rev. Kim initially drove JANE DOE to worship herself. On or about April 17, 2016, she introduced JANE DOE to GONCI, and in or about June 2016 she asked and assigned GONCI to drive JANE DOE home from Sunday worship—an assignment GONCI admitted under oath. From June through October 23, 2016, and on November 20, 2016, GONCI drove JANE DOE home alone.

35. Neither MORSEMERE COMMUNITY CHURCH nor CENTRAL ATLANTIC CONFERENCE gave JANE DOE and her mother any warning of the 2001 arrest or the retention vote and provided no chaperone, second rider, or check-in protocol. Because GONCI testified that he was "not a minister" and that his duties were purely secular (Gonci Dep. Vol. I 299:16–18), those decisions are governed by neutral principles of tort law.

36. CENTRAL ATLANTIC CONFERENCE vetted MORSEMERE COMMUNITY CHURCH's pastoral profile in 2015–2016, installed its own sitting Director as Pastor on May 1, 2016, and supervised her ministerial standing, yet it did not audit staff sexual-safety history at the church or require any rule barring unsupervised transport of vulnerable congregants by staff with prior child-endangerment arrests. Throughout March–November 2016, while Rev. Kim learned of JANE DOE's condition and assigned the rides, she acted within the scope of her dual role as installed pastor and sitting Conference Director. Associate Conference Minister Rev. Craig Peterson already knew of the 2001 charge and its disposition when he spoke with JANE DOE in August 2023.

37. During an early ride, JANE DOE confided in GONCI her psychiatric diagnoses, her prior jail detention, her inability to drive, and her fear of police and ICE. GONCI admitted under oath that he saw "red flags" in her because of her criminal record, her "deeply-set mental disorders," and her immigration problems, yet refused to leave her alone, yet he pursued her: he sent her a pornographic image with the message, "I only like girls who do this!", and in September 2016 appeared at her parents' home to "meet for sex." When she said she feared sexually transmitted infections, he drove her to a CVS pharmacy, administered an OraQuick HIV-only oral swab, and represented that he was disease-free, "safe" without a condom, and monogamous apart from a longtime partner, concealing that the test detects only HIV and, as he later admitted, that he was having unprotected intercourse with other partners.

**<u>II. October 23 and November 20, 2016: Commercial Sex Acts Obtained by Withholding the Ride Home Under ICE GPS Monitoring</u>**

38. On October 19, 2016, ICE arrested JANE DOE and released her under supervision requiring a GPS ankle monitor that had to be charged at home; she understood that a dead battery or being stranded away from home risked immediate re-detention. GONCI knew of the arrest and saw the monitor.

39. On Sunday, October 23, 2016, GONCI picked JANE DOE up after worship under the church arrangement, diverted the trip to a Fort Lee motel, and refused to drive her home unless she was first coerced into intercourse. At approximately 65 pounds, without a car or money, and terrified of an ankle-monitor violation, she had no reasonable alternative. Over her objections to his refusal to use a condom, GONCI penetrated her vaginally and anally and drove her home only afterward. The ride home was the thing of value given on account of the sex acts; the diversion and stranding under ICE GPS monitoring were the coercive means.

40. On or about November 20, 2016, GONCI again diverted the church ride to a motel, conditioned her return on coerced sex, and threatened to leave her stranded under GPS monitoring when she resisted. Two weeks later, on December 4, 2016, GONCI resigned from the church by text message and posted on Facebook, under the alias "Rick Allen," that he had quit because the new pastor was "demanding, controlling, manipulative, and uncompromising," a post he authenticated at his February 3, 2026 deposition. JANE DOE was then held in county jail custody from December 14, 2016 to April 20, 2017 and from May 12 to August 22, 2017, where her health collapsed so severely that she nearly died.

**III. 2017–2021: Commercial Sex Acts Procured Through Force, Strangulation, Threats of Legal Process, and Fraud**

41. Things of Value: After her August 22, 2017 release—without stable housing (she moved eleven times by February 2021), a car, money, or reliable access to medication—and reminding her that she would "never get a job with [her] record," GONCI offered $200 for anal intercourse; when she refused, he drove her to New Milford, subjected her to forceful intercourse, handed her cash, and made her delete his messages. From August 2017 through April 2021 he paid her cash after nearly every encounter, labeled "gas money" although she never drove, and paid for Uber, Lyft, and taxi rides to his residences and to BRIGHTON ASYLUM. He admitted, "I offered you money to get to me," and wrote in March 2020 that he had "offered to compensate you to COME OUT because you said you had no money to get to me" and that "[t]hat was the arrangement." When she tried to refuse the cash, he forced it on her "so you can buy some nice clothes and keep your mouth shut," and on April 19, 2021 he handed her $50 he said was owed to her.

42. Conditioned Labor and Assistance: On February 26, 2021, GONCI conditioned approximately five hours of moving and unpacking labor on sex that day, performed the labor, and

extracted the act. On September 1, 2021, after Hurricane Ida flooded her apartment, he conditioned emergency assistance on anal intercourse and came to her apartment that night—a fact he denied in his September 7, 2021 restraining-order filing but admitted at his February 17, 2026 deposition: "I was there at your apartment that night" (Gonci Dep. Vol. II 533:25–534:24).

43. Force and Restraint: GONCI, approximately 147 pounds, admitted taking a "dominant" role, blindfolding her, pulling her hair, and placing his hands on her neck during sex without her asking (Gonci Dep. Vol. I 322:24–323:19; Vol. II 395:3–8). On or about May 14, 2018, he arrived uninvited with a gag, blindfold, whip, paddle, and handcuffs, bound and gagged her, struck her with a paddle, and penetrated her, causing heavy uterine bleeding treated three days later. In multiple encounters, including in June 2021, he compressed her neck until she became faint or lost consciousness and slapped her awake. When she begged him to stop, he paused at most momentarily. GONCI admitted in sworn testimony in December 2021 that she "did not react well to it at all afterwards," yet he continued the same conduct. In September 2017 she awoke to find him penetrating her while pointing a camcorder at her; when she objected and demanded it, he said there was no tape and hid it.

44. Degradation: JANE DOE recalls that, during encounters, GONCI told her to "act like an Asian whore." GONCI has denied making that statement. He also called her "crazy" and, in writing, "LITERALLY insane." What GONCI did was sex trafficking—commercial sex acts obtained by force, fraud, and coercion—not a domestic dispute between intimate partners.

45. GONCI testified that consent "is given or withdrawn at the time of the act" and "has to be given or revoked every time." By his own standard, her demands that he stop revoked any purported consent. Anything GONCI may characterize as consent was coerced: she met him and submitted to coercion because of the force, threats, and fraud alleged and because, carless,

destitute, disabled, and fearing police and ICE action, she had no practical choice. His promises of romance and marriage were a grooming device, not a source of consent.

46. Threats of Police, Restraining Orders, and ICE: Whenever JANE DOE resisted his sexual demands, objected to cash payments, raised infection concerns, or tried to end contact, GONCI threatened police reports, harassment or extortion charges, restraining orders, and reports to ICE. He admitted meeting her "on a weekly and even bi-weekly basis from April 2016 to September 2021." In March 2018, after her HPV diagnosis, he threatened to have her arrested if she transmitted an infection; in March 2020, when she wrote that they "have to go our separate ways," he replied, "Mark my words...a week, a month, 6 months, you are going to regret doing this." He invoked her disability as a weapon ("You are unstable. You have a disorder") and treated her freezing during sex as consent (Gonci Dep. Vol. II 399:3–24).

47. Fraud: Relying on the September 2016 OraQuick representation, and compelled by his refusal to use a condom, JANE DOE was coerced into unprotected intercourse through September 2021. GONCI never asked his other partners to be tested and claimed there was no HPV test for men. She had no sexual intercourse or genital contact with any other person between April 2016 and September 2021, and her prior medical records reflect no sexually transmitted infection before GONCI. On January 11, 2018, after GONCI saw a vaginal lesion on her, he drove her to the office of Dr. Charles O. Uzoaru in East Orange, where testing reported January 15, 2018 diagnosed a low-grade squamous intraepithelial lesion (cervical dysplasia) and high-risk HPV; on January 19, 2018, GONCI used BRIGHTON ASYLUM's corporate email account (brightonasylum@mail.com) to send her a medical release to obtain those results. Testing on October 18, 2018 confirmed HSV-1 antibodies requiring daily suppressive therapy. GONCI nonetheless continued condomless vaginal and anal intercourse with her through September 2021 while continuing unprotected intercourse with untested partners. She suffered abnormal uterine

and vaginal bleeding treated at Englewood Hospital on May 17, 2018, March 25–26, 2019, and June 22, 2020; she tested positive again for high-risk HPV on August 4, 2026; and she has undergone colposcopies, cervical biopsies, and endocervical curettage on May 23, 2023, July 31, 2025, and October 20, 2026.

48. April 19, 2021 Recording and "Strike Two" Threat: On April 19, 2021, after calling her twice that afternoon, GONCI met JANE DOE in an Englewood parking lot. There, she asked him whether he was recording her; he said no, but he was secretly recording audio and video, as he has admitted under oath. He handed her $50, refused to take it back, and threatened that the next contact would be "strike two," after which he would press charges; when she pleaded that a police report could lead to ICE detention, he did not withdraw the threat. On May 3, 2021, GONCI resumed contact and told her he could fall in love with her.

49. September 2021 Death Threat and False Cross-Complaint: On September 5, 2021, GONCI threatened to kill JANE DOE if she contacted his family and wrote, "This will be strike 2 and this time I'm following through . . . You are unstable. You have a disorder." She applied for a restraining order on September 7, 2021. The same day GONCI filed a cross-complaint denying that he had been at her apartment on September 1, 2021—which he later admitted was false. GONCI testified: "It was a sexual relationship. It was not a dating relationship" (Gonci Dep. Vol. II 513:21–22), and explained that "[f]or the purposes of the TRO, it needs to be characterized in a way that we can proceed in the TRO" (id. 514:10–16).

50. The October 2021 Agreement: After the Family Part judge cautioned on September 15, 2021 that an adverse final restraining order could carry immigration consequences for her, JANE DOE and GONCI, with counsel, executed on October 1 and 4, 2021 a written Settlement and Mutual Civil Restraints Agreement under which both dismissed their cross-complaints in exchange for reciprocal restraints (the "Agreement"). GONCI admitted signing it (Gonci Dep. Vol.

II 449:8–10). Its Paragraph 3 provides: "both parties shall not contact Homeland Security and/or INS regarding the other party immigration status," with no exception for litigation subpoenas. JANE DOE fully performed by dismissing her complaint.

**IV. Reports to Law Enforcement and to the Church Defendants**

51. Overcoming the fear of police and ICE contact that GONCI had instilled, JANE DOE reported his sexual assaults, strangulation, cash payments, message deletions, ICE threats, and nonconsensual recording to local police in June, September, and October 2022, including that the October 2016 motel intercourse was coerced, and reported the trafficking and threatened exposure to the National Human Trafficking Hotline on January 25, 2025.

52. October 28, 2022 Report to Local Police: On October 28, 2022, JANE DOE reported to local police, in a recorded interview and a written investigation report, that in September 2017, days after her release from custody, GONCI offered her $200 for sex, picked her up in Hackensack, drove her to New Milford, gave her money after intercourse, and told her to delete all of his text messages and keep quiet, and that she felt forced to delete them; that after September 2017 "the sex started getting violent" and he videotaped her without consent; and that during intercourse GONCI strangled her, causing pain and restricted breathing, pulled her hair and forced her head down, applied pressure to the front and sides of her neck, and thrust violently while she told him she was in pain, telling her he would not do it so hard and then resuming. She reported neck and pelvic injuries she attributed to that conduct and asked that her injuries and the incidents be documented. That report, made years before she learned that GONCI claimed to hold any recordings, is a contemporaneous account of both the money given on account of sex and the force used to obtain it.

53. On June 6, 2022, JANE DOE reported in writing to Rev. Kim that GONCI had sexually assaulted her. Rev. Kim answered only that GONCI "no longer is the church organist,"

and later told JANE DOE that because she was not a U.S. citizen she had no standing to sue. On April 21, 2023, Rev. Kim texted that she hoped JANE DOE had not included "anything about how Rich left the church" because Rev. Kim would "get into serious trouble if anyone at church finds out." After the Council President's June 4, 2023 disclosure, Rev. Kim referred JANE DOE to Rev. Peterson, who on behalf of CENTRAL ATLANTIC CONFERENCE maintained that the church had done nothing wrong, discouraged her from suing, and conducted no investigation; on August 8 and 16, 2023, Rev. Kim declined to address GONCI in a letter JANE DOE requested, citing "personnel confidentiality." When she subpoenaed the Church Defendants' records of the 2001 investigation, retention vote, and safe-church policies, CENTRAL ATLANTIC CONFERENCE moved to quash on November 12, 2025, and MORSEMERE COMMUNITY CHURCH joined and adopted that motion.

54. MORSEMERE COMMUNITY CHURCH's Knowledge and Notice: MORSEMERE COMMUNITY CHURCH knew of the specific risk GONCI posed (a) from 2001, through its Council's own investigation and retention vote (Paragraph 33); (b) from its continued promotion of his concerts in the same newspaper that reported his arrest; (c) from March 2016, through its Pastor, of JANE DOE's emaciation, psychiatric disabilities, ICE supervision, and dependence on church transportation (Paragraph 34); and (d) from June 2016, of its own assignment of GONCI to drive her home alone. It received written notice of the abuse itself on June 6, 2022, when JANE DOE reported to Rev. Kim in writing that GONCI had sexually assaulted her; it received her requests beginning in February 2023 for a letter describing what the church knew about GONCI; it received her June 12, 2023 written memorialization of the Council President's account; and it responded with Rev. Kim's April 21, 2023 text fearing "serious trouble if anyone at church finds out," the August 2023 refusal citing personnel confidentiality, and its November 20–21, 2025 joinder in the motion to quash her subpoenas for its records of GONCI's employment, screening,

complaints, and the 2001 investigation and retention vote. The state court quashed those nonparty subpoenas, and the records have not been produced.

55. CENTRAL ATLANTIC CONFERENCE's Knowledge and Notice: CENTRAL ATLANTIC CONFERENCE acquired knowledge (a) in 2016, through its sitting Director, Rev. Kim, who learned of JANE DOE's condition and made the ride assignment while serving on its Board (Paragraphs 34 and 36); (b) on August 15, 2023, when JANE DOE wrote to its Associate Conference Minister for New Jersey, Rev. Craig Peterson, that MORSEMERE COMMUNITY CHURCH had retained GONCI after his 2001 arrest, assigned him to drive her without warning her, and exposed her to abuse and exploitation; and (c) through Rev. Peterson's responsive telephone call on its behalf, in which he stated in substance that the charge had been dismissed, maintained that the church had done nothing wrong, and discouraged her from suing, without communicating any investigative finding or corrective action. On November 12, 2025, it moved to quash her subpoenas for church and Conference records on the ground that it was not a party to the State Action, and MORSEMERE COMMUNITY CHURCH adopted that motion. Nine days later, on November 21, 2025, an attendee connected to JANE DOE's deposition under the registered email address of its counsel, as reflected in Veritext's Assignment Details for Job No. 7763844 (Paragraph 71); and on August 20, 2026 its counsel was among the recipients of defense counsel's email transmitting an open Dropbox link and an index of the files (Paragraph 78). CENTRAL ATLANTIC CONFERENCE thus had actual notice of JANE DOE's claims and of the coercive use of the files no later than November 2025.

56. Preservation Notice: By letter dated June 19, 2025, captioned "Formal Litigation Hold and Spoliation Notice," JANE DOE notified BRIGHTON STUDIOS LLC, care of Mark Hikind at 306 Francis Street, Teaneck, New Jersey, and an affiliated entity identified in the letter as Brighton Studios NJ LLC, formed on or about May 7, 2025, of their obligation to preserve,

without alteration or deletion and including metadata and native formats, all documents and electronically stored information from January 1, 2016 to the present concerning the claims of sex trafficking and sexual assault and the ownership, control, and operation of the Premises, including formation and governance records, membership and beneficial-ownership records, asset transfers between the Brighton entities, ScarEntertainment LLC, and GONCI, deeds, leases, and management agreements, financial and rent records, litigation records, police and incident records, and communications reflecting GONCI's ownership, agency, or control. The letter directed suspension of auto-delete routines, identification of any material lost on or after June 1, 2024, and written certification of compliance within seven days, and its proof of service certifies that it was served on June 20, 2025 by certified mail, return receipt requested, on Mark Hikind as agent of BRIGHTON STUDIOS LLC. JANE DOE also sent the spoliation letter to MORSEMERE COMMUNITY CHURCH and CENTRAL ATLANTIC CONFERENCE. Independently, each Defendant has been under a duty to preserve relevant evidence since it reasonably anticipated litigation—GONCI and BRIGHTON ASYLUM no later than the August 28, 2023 commencement of the State Action; MORSEMERE COMMUNITY CHURCH no later than JANE DOE's June 6, 2022 written report; CENTRAL ATLANTIC CONFERENCE no later than her August 15, 2023 written report; and BRIGHTON STUDIOS no later than June 20, 2025. That duty extends to the source external hard drive and recording devices, camera and access-control records for the Premises, lease, inspection, and insurance files, and the Church Defendants' 2001 investigation, retention, screening, and safe-church records. Any loss or destruction of that evidence after those dates warrants an adverse inference against the responsible Defendant.

**V. BRIGHTON ASYLUM's Corporate Facilities and Benefits, and BRIGHTON STUDIOS' Knowledge**

57. Common Control: Although financing filings reference Steven Landman and Mark Hikind, sworn records show common control by GONCI: (a) in four sets of certified discovery responses in October 2024 and October 2025, GONCI swore that intimate encounters occurred "at one of the locations owned by Scarentertainment LLC," referring to 2 Brighton Avenue; (b) in Yuelling v. Brighton Asylum, No. OCN-L-1544-18, counsel certified under oath on May 7, 2019 that GONCI completed the joint insurance application for all three entities, that "Mr. Gonci is the sole owner of the three defendant corporate entities," and that he "was in control of the premises"; (c) in Baker, Cabrera, Sidoti, and Yuelling, the entities shared defense counsel, Travelers coverage procured by GONCI, and cross-indemnification; (d) GONCI exercised exclusive physical dominion over the Premises' rooms, locks, and cameras; and (e) on August 13, 2025 GONCI falsely certified that "Brighton Studios LLC shares no connection with Brighton Asylum" to quash ownership subpoenas, before conceding the lease at his February 3, 2026 deposition. These facts are peculiarly within Defendants' possession and are likely to have further evidentiary support after discovery.

58. From late October 2016 through 2021, GONCI used BRIGHTON ASYLUM's facilities, staff, and systems to harbor and isolate JANE DOE, telling her he preferred the Premises to motels because motels created records. He issued signed BRIGHTON ASYLUM admission passes honored by door staff, paid for rides to the Premises, and locked her inside Escape Room 1408—a commercial room furnished with a bed—and a storage unit. He testified that the room "is open to customers at certain times" but "[n]ot when you and I were there," that its cameras are "usually on," and that they were "shut off so that somebody else could not witness a private moment between you and I" (Gonci Dep. Vol. I 118:24–119:1, 121:1, 121:15–17). He answered

business calls while ordering her to stay silent and summoned her through the cellular telephone number BRIGHTON ASYLUM publishes as its business contact, (201) 848-2517, and through its corporate email accounts, scarentertainmentllc@yahoo.com and brightonasylum@mail.com. JANE DOE's phone stored the Premises as "Genna Haunt," and GONCI called it "the haunt."

59. BRIGHTON ASYLUM benefited from the venture during 2016–2021 by retaining its sole executive's on-site presence and call-handling during operating hours without off-site lodging costs and by shielding him from motel records and police intervention during peak seasons; upon information and belief, it also entered JANE DOE's contact data into its marketing database. In May 2025 it ratified the venture by filing files it represents were recorded in Escape Room 1408 and the storage unit to seek dismissal of the claims against it and a $70,000 sanctions award. Those benefits flowed directly from the use of its commercial rooms, staff, passes, and security systems for the sex acts alleged in Count I.

60. BRIGHTON ASYLUM's Knowledge and Notice: Beyond the knowledge of its sole owner and CEO, BRIGHTON ASYLUM's door staff honored GONCI-signed passes and admitted JANE DOE through the business's entry procedures beginning in late October 2016; the business retained her admission contact information for marketing, and its advertising continued reaching her after the October 2021 civil restraints; and, through its counsel, it received JANE DOE's written objections of December 27, 2023 and June 20, 2024 to any storage, access, transmission, or disclosure of the files, and her May 22, 2025 written demand, before each disclosure alleged in Part VII.

61. BRIGHTON STUDIOS collected rent pledged to its $5,000,000 mortgage and received tax, depreciation, and indemnification benefits. GONCI's knowledge is imputed to it through the control facts in Paragraph 57. Independently, observable warning signs put it on notice of coercion, not merely private sex: over nearly five years a visibly cachectic, approximately 65-

pound disabled woman arrived by rideshare without a car, presented GONCI-signed passes, and was escorted past public queues into locked rooms; Escape Room 1408 and the storage unit were locked from inside for hours while the cameras were disabled; and the leases reserved inspection rights that any reasonable landlord inspection or insurer audit would have exercised.

62. BRIGHTON STUDIOS' Knowledge and Notice: BRIGHTON STUDIOS knew its tenant and the tenant's principal: in Baker v. ScarEntertainment, LLC, its counsel certified in July 2019 that BRIGHTON ASYLUM was its tenant, and it appeared with BRIGHTON ASYLUM through shared defense or insurance arrangements in Baker, Yuelling, Cabrera, and Sidoti. Its leases restricted the space to commercial operations, prohibited unlawful or disreputable uses, reserved landlord entry and inspection rights, and assigned it roof and structural maintenance responsibilities, giving it recurring access to the Premises during the 2016–2021 period; GONCI acknowledged that his lease covered business activities and not personal activities. When JANE DOE subpoenaed its ownership and lease records in 2025, GONCI and BRIGHTON ASYLUM moved to quash and the subpoenas were quashed, and the records have not been produced; GONCI had certified on August 13, 2025 that "Brighton Studios LLC shares no connection with Brighton Asylum," then acknowledged at deposition that BRIGHTON STUDIOS owns the building and that he holds a lease. The extent of its representatives' inspections and knowledge is peculiarly within its possession, and JANE DOE has demanded preservation of that evidence (Paragraph 56).

## **VI. The Files: JANE DOE Never Consented, Has Never Viewed Them, and Denies Their Authenticity**

63. JANE DOE never permitted GONCI to photograph, film, or record her. Apart from the September 2017 camcorder incident, she first learned on December 12, 2023, when defense counsel wrote that Defendants possessed "prurient videos," that GONCI claims to hold recordings made during their encounters. GONCI and BRIGHTON ASYLUM represent that GONCI made

twenty-eight video files and one image using his business-linked cellphone and a Sony HDR-CX675 camcorder, including inside Escape Room 1408 and the storage unit, and transferred them to an external hard drive. GONCI could not identify a single occasion on which he obtained her permission to record.

64. Processed Copies; Originals Withheld: GONCI testified that the files went "[d]irectly to the hard drive" and are "completely raw and unedited" (Gonci Dep. Vol. I 164:13–165:13). Defendants opposed JANE DOE's motion to compel forensic examination of the devices, declined her deposition request for access (id. 216:2–10), omitted file MAH00147.MP4 from their motion exhibits, and have produced only thumb-drive copies. On March 6, 2026, her forensic examiner, John Lucich of eForensix, and three technicians signed the protective order's undertaking; on March 9, 2026 defense counsel's office refused to release the source drive to them.

65. Forensic Findings: Lucich's April 7, 2026 report addresses twenty-eight video files and one image Defendants produced. It finds that ten of the twenty-seven files with available metadata carry modification timestamps of September 9, 2021, between approximately 9:04 p.m. and 10:42 p.m.—two days after JANE DOE applied for a restraining order—that are "significantly later than their creation dates," which "suggests a common post-creation event (e.g., file transfer, export, or system-level interaction)"; that one file lacks modification timestamps; that file 00166.MTS carries a device-clock date of October 4, 2016, inconsistent with Defendants' index attributing it to September 14, 2020; and that without the source drive "it is not possible to determine whether the files on the thumb drives are complete and unaltered." Upon information and belief, Defendants knew the copies they produced and disclosed were processed, non-original copies whose integrity could not be verified.

66. Her Position in Context: JANE DOE has never viewed the files and therefore cannot, and will not, authenticate, identify, or "own" them. She denies that the processed, non-original

copies Defendants produced are authentic or that they accurately depict her. She does not allege from personal knowledge that the files were altered; she relies on the forensic findings in Paragraph 65. In her sworn certification filed in the State Action on May 26, 2025, she stated that Defendants "have failed to produce original devices, chain of custody records, metadata, or any competent forensic authentication"; that she is "under no obligation to view, identify, or authenticate any sexually explicit content"; that, "[b]ecause I have never viewed or had possession of these alleged videos, I have no personal knowledge of their contents"; and that her refusal to identify their contents "is a direct result of Defendants' refusal to provide me access to the original devices." Her sworn statement in that certification—"I unequivocally deny appearing in any such material"—was made in that context. On December 16, 2025, the state court ruled that she "is not required to view videos involving the parties engaged in explicit sexual contact during her deposition."

67. JANE DOE does not allege what the files show and pleads them solely as Defendants represent them. Her claims resting on the files (Counts V, VII, and VIII(a)) are pleaded in the alternative under Fed. R. Civ. P. 8(d)(2)–(3), to the extent the files depict JANE DOE, as Defendants represent. To that extent, they were created without her consent, and she has never consented to their transfer, display, or disclosure.

## **VII. Defendants' Use of the Files to Coerce Abandonment of the State Action**

68. Demands for Confidentiality Terms: Defendants' December 12, 2023 letter offered to share "a series of prurient videos" "[p]rovided that you are willing to enter into an appropriate confidentiality agreement" and threatened sanctions unless she withdrew the State Action within twenty-eight days. Her counsel served written notices of nonconsent on December 27, 2023 and June 20, 2024. On September 12, 2024, defense counsel wrote to her directly demanding dismissal within thirty days, warned that public exposure would be "entirely of your own devices," and

assured her that "we have not and will not" distribute sexually explicit videos. Defendants' October 31, 2024 letter brief opposed forensic examination and blamed "a refusal of Plaintiff to enter into a protective order and/or confidentiality agreement." She served a written cease-and-desist demand on May 22, 2025.

69. The Protective Order: On April 15, 2025, the state court entered a Discovery Confidentiality Order ("DCO") covering "any and all prurient, salacious, or sexually explicit materials," limiting disclosure to enumerated persons, forbidding disclosure "in any manner to any other individual," and requiring under its Paragraph 4 that counsel obtain a signed Agreement to Be Bound before disclosing confidential material to any permitted recipient, and requiring that any proceeding involving confidential material be conducted with no unauthorized person present.

70. Shipments and Filings: On May 1 and June 2, 2025, GONCI and BRIGHTON ASYLUM shipped the files to JANE DOE's home by FedEx on unencrypted USB drives, the second over her written demand; she surrendered both unopened to police. On May 22, 2025, they filed truncated excerpts, omitting file MAH00147.MP4, in support of a summary-judgment motion and a $70,000 sanctions demand, both denied on September 29, 2025.

71. Attempted Display Before Unsigned Non-Parties: At JANE DOE's remote depositions on November 19 and 21, 2025 and January 13, 2026, conducted on the platform of Veritext Legal Solutions, defense counsel announced and repeatedly attempted to display the files over her objection. Present were Veritext court reporters Rita DeBlasio (November 19) and Kadienne Stoute (January 13), a Veritext-assigned reporter (November 21), videographers Marco Sozio, Kevin Gallagher, and Allan Paller, GONCI, and, on November 21, 2025, an attendee never identified on the record who connected under the email address of counsel for non-party CENTRAL ATLANTIC CONFERENCE (certified errata to Pl. Dep. Vol. IV 406:14–22), whom Veritext's Assignment Details (Job No. 7763844) list as an "ATTENDEE" with "NO NAME

PROVIDED." Upon information and belief, an attorney representing no party also remained connected, unidentified, for approximately five and one-half hours on January 13, 2026. No record reflects that any of these persons signed the DCO undertaking; JANE DOE herself had to email the DCO to the reporter on November 19, 2025.

72. No file was played on November 19 or 21, 2025 (Pl. Dep. Vol. III 333:14–336:20; Vol. IV 412:1–415:22). On January 13, 2026, defense counsel cued a clip and paused it (Vol. V 588:9–12). The November 19 videographer stated that "the video clips are immediately uploaded to the portal, Veritext portal" (Vol. III 331:1–3); the January 13 videographer stated he was not recording the shared screen (Vol. V 606:24–607:20) and that "I don't know if anyone is deemed this confidential or not" (id. 610:20–22). JANE DOE does not allege that Veritext received or stored any file. Defendants alone know whether, to whom, and by what means any file or clip was transmitted, and, upon information and belief, discovery will show to whom else the files have been transmitted.

73. Staging of the Files on the Vendor Platform: The January 13, 2026 record shows that the files were prepared for display through Veritext's platform. When JANE DOE told the Veritext videographer, Allan Paller, that she objected to the transmission of the files online, he responded that he "will not be recording the video . . . when it's played," that "[m]y screens are separate," that he was "not recording the shared screen unless that's stipulated," and that he could record the shared screen if the attorney and she agreed (Pl. Dep. Vol. V 606:24–607:20); defense counsel then stated, "All I know is that Mr. Paller represented that they would not be recorded" (id. 609:23–24), and acknowledged that he had tried to upload the files to the court but they were too large (id. 609:19–21). Those statements show that the files were loaded and ready to be played through the vendor's platform before the vendor personnel present. Upon information and belief, Defendants transmitted the files, or made them available, to Veritext and its videographer for display. No

Veritext reporter, videographer, or other vendor representative signed the DCO's Agreement to Be Bound, as Paragraph 4 of the April 15, 2025 DCO requires before confidential material is disclosed to any permitted recipient, and the videographer stated, "I don't know if anyone is deemed this confidential or not" (id. 610:20–22).

74. Defendants' Own Precondition, Then Their Own Breach: For sixteen months Defendants insisted that the files could be handled only under a confidentiality agreement or protective order (Paragraph 68). Once the DCO was entered, they disregarded its undertaking requirement and sought to display the files before vendors and an attendee who had signed nothing, while JANE DOE's own forensic team signed the undertaking before handling any material (Paragraph 64). Defendants thus disseminated processed copies of material they call "prurient," while withholding the originals that would confirm or refute their own representations.

75. Coercion at Deposition: When JANE DOE objected, "I do not consent" (Pl. Dep. Vol. III 333:18–24), defense counsel told her: "Drop your case. That's your only real choice because we're going through them today" (id. 334:22–23). On November 21, 2025, he told her he had "a duty . . . to show these videos" and "have you confirm or not confirm the authenticity by watching the videos" (Vol. IV 412:23–413:3), and when she objected, declared, "All right. Deposition's over then" (id. 415:10–11); she submitted to coercion by suspending the deposition to seek the court's guidance.

76. Coercion After the Court's Ruling: Defendants moved to compel her to view the files, and on December 16, 2025 the state court ruled that she "is not required to view videos involving the parties engaged in explicit sexual contact during her deposition." On January 13, 2026, when she said, "I don't have to watch this," defense counsel answered, "Yes, you do. You actually do" (Vol. V 596:9–10), declared, "This deposition's over until you own the videos" (id. 604:3–4), and offered her the "proposition" that she either watch the video or accept that "all

references to them will be precluded from being utilized in any trial or summary judgment going forward" (id. 613:22–614:5). Those demands—that she view, and thereby vouch for, unverified copies of material she has never seen, or forfeit her evidence—were coercive and were directed at a person who is not a U.S. citizen and whom Defendants knew feared police and ICE action.

77. Court Uploads Without Notice (Not Pleaded as Public Disclosure): On March 27, 2026, defense counsel uploaded to the court's SharePoint site for the State Action a folder titled "Requested Video Evidence," which the site lists as modified on "March 27" by defense counsel's email address and which, upon information and belief, contained the files. JANE DOE received no notice and was not copied on any communication requesting the upload; Defendants' April 2, 2026 filing was captioned "Disclosed Videos Uploaded to Court." The files were removed after she objected and re-uploaded in August 2026. The state court found on August 4, 2026 that the SharePoint folder is a private, court-controlled repository accessible to chambers; JANE DOE therefore pleads these uploads only as conduct without notice to her and as part of Defendants' coercion, not as public disclosures.

78. Dropbox Link (Pleaded as Context and Notice Only): On August 20, 2026, defense counsel emailed an open, password-free Dropbox link to multiple recipients, including counsel for non-party CENTRAL ATLANTIC CONFERENCE, to a folder counsel described as containing the file Defendants designated as the April 19, 2021 video (their Exhibit G), and on September 2, 2026 printed the live link on the public docket, where it remained accessible without a login through at least October 8, 2026. JANE DOE has not opened the folder and does not allege that it contained any sexually explicit recording.

**<u>VIII. The ICE Subpoena, the Immigration Documents, and Relocation</u>**

79. On October 6, 2025, GONCI's litigation counsel, acting on his behalf and without any statute or court order compelling it, served a subpoena on DHS/ICE in Newark identifying

JANE DOE and demanding "[a]ny and all immigration records" regarding her, including her "October 19, 2016 arrest" and "gps ankle monitoring records." Because that contact directed ICE to her identity and file while GONCI knew her address and refused to disclose ICE's response, JANE DOE reasonably feared an enforcement visit; after the Family Part declined jurisdiction on October 7–8, 2025, she vacated her home and moved in with a family member, incurring relocation, incremental housing and living, and mitigation expenses.

80. On May 19 and 27, 2026, in response to a therapy-records subpoena calling only for treatment and billing notes, defense counsel received unredacted copies of JANE DOE's immigration and identification documents, which the clinic later acknowledged in writing had been produced in error. Defendants designated her own documents "For Attorney's Eyes Only" and have refused her written demands of May 24, May 29, and June 4, 2026 to return or destroy them, to state whether GONCI holds copies, or to disclose what ICE produced, prolonging her displacement.

81. Damages: As a direct and proximate result, JANE DOE has suffered cervical disc herniations and EMG-documented bilateral cervical radiculopathy, chronic headaches, and functional limitations from strangulation and violence; uterine and vaginal bleeding, persistent high-risk HPV, cervical dysplasia, and herpes requiring repeated invasive procedures (Paragraph 47); humiliation, invasion of privacy, and fear of dissemination; and displacement and relocation expenses since October 2025. She seeks no recovery here for standalone psychiatric disorder or treatment, or for injury attributable solely to the August 28, 2021 incident, and no duplicate recovery.

## TIMELINESS AND TOLLING

82. Counts I through IV and the federal theory of Count XIII are timely under 18 U.S.C. § 1595(c)(1), which permits suit within ten years after the cause of action arose. The first

commercial sex act occurred on October 23, 2016; excluding that day under Fed. R. Civ. P. 6(a)(1)(A), the period runs through October 23, 2026, the date of filing. Each later act through September 2021 is independently timely, and the claims are timely as a whole as a continuing course of trafficking. Earlier contact is alleged as background.

83. Count V is timely under 28 U.S.C. § 1658(a) because every disclosure on which it rests occurred in 2025 or 2026, after the October 1, 2022 effective date of 15 U.S.C. § 6851. Counts XII and XIII arise from the October 6, 2025 subpoena and the May–June 2026 acquisition and retention of her documents and are timely under N.J.S.A. 2A:14-1 and 2A:14-2.

84. Counts VI through XI, which seek damages for injuries resulting from human trafficking, sexual assault, and nonconsensual recording of an adult, are timely under N.J.S.A. 2A:14-2a(b)(1), which runs seven years from reasonable discovery: every act after October 23, 2019 is within seven years; JANE DOE did not reasonably discover the causal relationship between GONCI's conduct and her injuries until December 13, 2021, the Council's 2001 investigation and retention vote until June 4, 2023, or the files until December 12, 2023. Alternatively, limitations were tolled under N.J.S.A. 2A:14-2a(c), 2A:14-21, and equitable tolling by her adjudicated disabilities, GONCI's continuous duress through 2021, his concealment of recording, and the Church Defendants' concealment of the 2001 records.

## CAUSES OF ACTION

## FEDERAL CLAIMS

### COUNT I
### Sex Trafficking — Perpetrator Liability

**18 U.S.C. §§ 1591(a)(1), 1594(a), and 1595(a)**
**(Against GONCI)**

85. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

86. Elements: GONCI knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited JANE DOE, in and affecting interstate commerce (Paragraph 26), knowing or in reckless disregard that force, threats of force, fraud, coercion, or a combination of them would be used to cause her to engage in commercial sex acts, and attempted to do so (§ 1594(a)).

87. Recruitment, Transportation, Harboring, Obtaining, and Patronizing: GONCI recruited and enticed JANE DOE through the church ride assignment, grooming messages, and promises of romance (Paragraphs 34 and 37); transported her to a Fort Lee motel, to New Milford, to his residences, and, by his car and paid rides, to the Premises (Paragraphs 39–41); harbored and maintained her in locked Escape Room 1408 and the storage unit (Paragraph 58); and obtained and patronized her for sex acts for which he gave things of value (Paragraphs 41–42).

88. Commercial Sex Acts (§ 1591(e)(3)): Each act was a commercial sex act because GONCI gave a thing of value on account of it: (a) return rides from worship on October 23 and November 20, 2016 (Paragraphs 39–40); (b) $200 and transport in 2017, recurring cash ("gas money," "the arrangement," and $50 on April 19, 2021), paid rides, and BRIGHTON ASYLUM passes from August 2017 through April 2021 (Paragraphs 41 and 58); (c) moving labor on February 26, 2021; and (d) emergency flood assistance on September 1, 2021 (Paragraph 42), the last pleaded alternatively as an attempt under § 1594(a).

89. Particular Acts Connected to Particular Means: (a) October 23 and November 20, 2016: GONCI withheld the ride home from worship until he had obtained condomless vaginal and anal intercourse, coercing a 65-pound, carless, disabled woman by stranding her at a motel

while he knew she wore an ICE GPS ankle monitor placed four days earlier;

(b) Late August or September 2017: GONCI offered $200 for anal intercourse, transported her to New Milford, overrode her refusal by physical force, paid her cash, and made her delete his messages, exploiting her destitution days after she nearly died in custody;

(c) August 2017 through April 2021: GONCI gave cash, paid rides, and BRIGHTON ASYLUM passes on account of sex acts procured through strangulation to faintness or unconsciousness, the May 14, 2018 binding, gagging, and paddling, refusals to drive her home unless she took his cash and submitted to coercion, threats of police charges, restraining orders, and ICE reports (including in March 2018, March 2020, and April 2021), and fraudulent infection-safety assurances;

(d) February 26, 2021: GONCI gave five hours of moving labor expressly conditioned on sex that day, against the established pattern of strangulation and his threat that she would "regret" ending the arrangement; and

(e) September 1, 2021: GONCI conditioned emergency flood assistance on anal intercourse and came to her flooded apartment that night, exploiting an acute emergency under the shadow of his "strike two" threat.

90. Means and Serious Harm (§ 1591(e)(1), (2), (5)): GONCI personally applied (a) force and restraint, including strangulation to unconsciousness, binding, gagging, and paddling (Paragraph 43); (b) stranding under ICE GPS monitoring (Paragraph 39); (c) threats of police charges, restraining orders, and ICE reports, which constitute threatened abuse of legal process and coercion (Paragraphs 46, 48, and 49). Her October 28, 2022 report to local police described the same money and force (Paragraph 52); and (d) fraud regarding infection safety (Paragraphs 37 and 47). That harm was sufficiently serious to compel a reasonable person of her background and circumstances—a 65-pound, disabled person who is not a U.S. citizen, under ICE supervision,

who had nearly died in custody—to perform commercial sex acts to avoid it. GONCI's admission that the relationship "was not a dating relationship" and that he used that label only "[f]or the purposes of the TRO" (Paragraph 49) rebuts any relationship defense and is itself abuse of legal process under § 1591(e)(1), continued through his use of the files and litigation process (Paragraphs 75–76).

91. Knowledge and Damages: GONCI devised and applied each means and knew the value he gave was given on account of sex. His violations proximately caused the injuries in Paragraph 81, entitling JANE DOE to compensatory and punitive damages and attorneys' fees under 18 U.S.C. § 1595(a).

92. Attempt (§ 1594(a)): To the extent any act alleged in Paragraph 89 was not completed as a commercial sex act, including the September 1, 2021 flood-assistance demand, GONCI attempted to violate § 1591(a)(1) by taking substantial steps—conditioning the thing of value on sex and traveling to her apartment—with the required intent.

**COUNT II**
**Sex Trafficking — Perpetrator, Venture, and Alternative Beneficiary Liability**
**18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and 1595(a)**
**(Against BRIGHTON ASYLUM)**

93. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

94. BRIGHTON ASYLUM: BRIGHTON ASYLUM is liable as a corporate perpetrator (§ 1591(a)(1)), a knowing venture participant (§ 1591(a)(2)), and, alternatively, a beneficiary (§ 1595(a)). GONCI's acts and knowledge as its sole owner and CEO, deploying its rooms, locks, cameras, passes, staff, telephone, and email within his authority, are its own (Paragraphs 17–18 and 58). Through him it enticed, harbored, and maintained JANE DOE for the commercial sex acts in Count I, knowingly benefited (Paragraph 59), and ratified the venture in May 2025. Its

benefits flowed from participation in the venture during 2016–2021, not merely from later litigation. BRIGHTON ASYLUM's additional knowledge and notice are alleged in Paragraph 60.

95. Elements Applied: (a) BRIGHTON ASYLUM is a "person" under 1 U.S.C. § 1; (b) through GONCI acting within his authority as its sole manager and CEO, it harbored, maintained, enticed, and obtained JANE DOE on its Premises using its passes, door staff, rooms, locks, and cameras (Paragraphs 58 and 60); (c) it knew of the force, fraud, and coercion because its sole manager devised them (Paragraphs 43–49); (d) its participation in the venture was knowing assistance, support, and facilitation under § 1591(e)(4); and (e) it benefited financially and by receiving things of value (Paragraph 59).

96. These violations occurred in and affected interstate commerce and proximately caused JANE DOE's injuries at the Premises (Paragraph 81), entitling her to compensatory and punitive damages and attorneys' fees under 18 U.S.C. § 1595(a).

**COUNT III**
**Sex Trafficking — Venture Participant and Single-Enterprise / Alter-Ego Liability**
**18 U.S.C. §§ 1591(a)(2) and 1595(a)**
**(Against BRIGHTON STUDIOS LLC)**

97. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

98. For violations at the Premises on and after November 7, 2016, BRIGHTON STUDIOS is liable under §§ 1591(a)(2) and 1595(a) because it knowingly benefited, financially and by receiving things of value—rent pledged to its $5,000,000 mortgage, tax and depreciation benefits, and indemnification (Paragraph 61)—from participation in a venture with GONCI and BRIGHTON ASYLUM that engaged in the sex trafficking alleged in Count I, and it assisted, supported, and facilitated that venture (§ 1591(e)(4)) by supplying Escape Room 1408 and the storage unit (Paragraph 58).

99. Participation in a Venture (§ 1591(e)(6)): GONCI, BRIGHTON ASYLUM, and BRIGHTON STUDIOS were two or more persons associated in fact through the ownership, financing, leasing, and operation of the Premises (Paragraphs 57 and 61); BRIGHTON STUDIOS' supply and maintenance of the rooms used for the trafficking, while collecting rent and reserving inspection rights, was participation in that venture.

100. Knowledge and Alter Ego: GONCI acted as BRIGHTON STUDIOS' beneficial principal or managing agent with exclusive physical control of the Premises' rooms, locks, and cameras, and the entities operated as a single enterprise, as shown by the sworn ownership statements, joint insurance and defense, guaranty, and false August 13, 2025 certification in Paragraph 57. His actual knowledge of the means used is therefore imputed to BRIGHTON STUDIOS, and adherence to the fiction of separateness would sanction fraud and promote injustice. These violations proximately caused JANE DOE's injuries at the Premises, entitling her to compensatory and punitive damages and attorneys' fees under 18 U.S.C. § 1595(a), jointly and severally. BRIGHTON STUDIOS' independent knowledge and notice are alleged in Paragraph 62.

**COUNT IV**
**Sex Trafficking — Civil Beneficiary Liability**
**18 U.S.C. § 1595(a)**
**(Against BRIGHTON STUDIOS LLC, in the Alternative)**

101. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

102. In the alternative to Count III, even if its managers were independent of GONCI, BRIGHTON STUDIOS (1) knowingly benefited, financially and by receiving things of value, through rent, mortgage debt-service coverage, tax and depreciation benefits, and contractual indemnification; (2) from participation in a continuous premises-ownership, financing, and

operation venture with GONCI and BRIGHTON ASYLUM; (3) that it knew or should have known engaged in sex trafficking, because repeated, conspicuous signs of coercion at its own property—an emaciated disabled woman escorted into locked rooms with security cameras disabled—were observable to any landlord exercising the inspection rights it reserved (Paragraph 61). The facts of internal governance are peculiarly within Defendants' possession, and GONCI has testified that "Brighton Studios owns the building" (Gonci Dep. Vol. II 426:9) while resisting ownership discovery. Its notice is further alleged in Paragraph 62, and any spoliation of its inspection, lease, or camera records warrants an adverse inference on knowledge (Paragraph 56).

103. Knowledge Through Notice: The specific facts placing BRIGHTON STUDIOS on notice include its counsel's July 2019 certification that BRIGHTON ASYLUM was its tenant, its shared defense and insurance arrangements in four premises cases, its reserved entry, inspection, and maintenance rights, GONCI's false August 13, 2025 certification denying any connection, the quashing of subpoenas for its records, and JANE DOE's June 19, 2025 litigation-hold letter served June 20, 2025 (Paragraphs 62 and 56).

104. BRIGHTON STUDIOS' participation proximately caused JANE DOE's injuries at the Premises from November 7, 2016 forward, entitling her to compensatory and punitive damages and attorneys' fees under 18 U.S.C. § 1595(a).

**COUNT V**
**Nonconsensual Disclosure of Intimate Visual Depictions**
**15 U.S.C. § 6851**
**(Against GONCI, BRIGHTON ASYLUM, and the Doe Defendants)**

105. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

106. Elements: Under 15 U.S.C. § 6851(b)(1)(A), an individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility

of interstate or foreign commerce, without her consent, may sue a person who made the disclosure knowing that, or recklessly disregarding whether, she had not consented to the disclosure. To "disclose" means "to transfer, publish, distribute, or make accessible." § 6851(a)(4). Defendants characterize the files as "prurient videos," identify JANE DOE by name in their indices and filings, and represent that the files depict her engaged in sexual conduct. JANE DOE has not viewed the files and denies their authenticity (Paragraph 66); she pleads this Count in the alternative, to the extent the files depict her, as Defendants represent (Paragraph 67). To that extent, the files are intimate visual depictions under § 6851(a)(5)(A), and she is a "depicted individual" identifiable "from information displayed in connection with the visual depiction" under § 6851(a)(3), because Defendants have labeled and indexed the files with her name.

107. No Consent (§ 6851(a)(2), (b)(2)(A)): "Consent" means "an affirmative, conscious, and voluntary authorization made by the individual free from force, fraud, misrepresentation, or coercion." § 6851(a)(2). JANE DOE never authorized the creation or any disclosure of any recording (Paragraph 63); any purported authorization would have been obtained through the force, fraud, and coercion alleged in Paragraphs 39–49; and under § 6851(b)(2)(A), consent to creation, which she never gave, would not establish consent to distribution. She expressly withheld consent to any storage, viewing, transmission, or disclosure in writing on December 27, 2023, June 20, 2024, and May 22, 2025, and on the record on November 19, 2025 (Paragraphs 68 and 75).

108. Disclosures, Generally: Using FedEx, interstate email and cloud networks, and Veritext's online deposition platform (Paragraph 26), GONCI and BRIGHTON ASYLUM, acting through their shared counsel and the Doe Defendants, made each of the separate disclosures alleged in Paragraphs 109 through 113. Each is a separate disclosure under § 6851(a)(4) and a separate basis for relief under § 6851(b)(3)(A). Upon information and belief, discovery will identify further transfers to vendors, consultants, and others. JANE DOE does not base this Count

on the court SharePoint uploads or on the August 20, 2026 Dropbox link, which she pleads only as evidence of notice, course of handling, and bad faith (Paragraphs 77–78).

109. First Disclosure — May 1, 2025 FedEx Shipment: On May 1, 2025, GONCI and BRIGHTON ASYLUM, through counsel, transferred files they represent are intimate visual depictions of JANE DOE on an unencrypted USB drive, placing them in the custody of FedEx, an interstate commercial carrier, for delivery to her residence. They did so after JANE DOE's counsel had objected in writing on December 27, 2023 and June 20, 2024 to any storage, viewing, transmission, or disclosure of the recordings, and after defense counsel had assured her in writing on September 12, 2024 that "we have not and will not" distribute them (Paragraph 68). The shipment was unencrypted, was not addressed to any counsel, and was handed to a carrier and to whoever might receive it at her residence, none of whom was bound by any confidentiality undertaking. The transfer to and through the carrier was a transfer and a making accessible within § 6851(a)(4).

110. JANE DOE's Response to the May 1 Shipment: JANE DOE did not open the package or view its contents. She surrendered it, unopened, to local police, who kept it in their custody. It remained in police custody until March 16, 2026, when local police released the thumb drives Defendants had sent her directly to her forensic examiner, eForensix, whose examiner and technicians had signed the protective order's undertaking on March 6, 2026 before handling any material (Paragraph 64). At no time did JANE DOE open, view, or possess the contents. Defendants' shipment forced her to involve law enforcement to protect herself from material she had not asked for and had objected to receiving.

111. Second Disclosure — June 2, 2025 Mailing Over Her Express Instruction: On May 22, 2025, JANE DOE served a written cease-and-desist demand that the files not be sent to her home or distributed to others. On or about June 2, 2025, GONCI and BRIGHTON ASYLUM,

through counsel, nonetheless shipped by FedEx to her residence a second unencrypted USB drive that, they represent, contained the same files. That second transfer through an interstate carrier, made eleven days after her express written instruction, was a separate disclosure within § 6851(a)(4) made with actual knowledge that she had not consented. JANE DOE again did not open it; she surrendered it unopened to local police, and it was released with the first drive to her forensic examiner on March 16, 2026 (Paragraph 64).

112. Third Disclosure — May 22, 2025 Excerpts: On May 22, 2025, GONCI and BRIGHTON ASYLUM transferred truncated excerpts of the files, designated their Exhibit D, in support of a summary-judgment motion and a $70,000 sanctions demand, both of which were denied on September 29, 2025, while omitting file MAH00147.MP4 and withholding the source drive (Paragraphs 70 and 64).

113. Fourth Through Sixth Disclosures — Deposition Platform: At her remote depositions on November 19 and 21, 2025 and January 13, 2026, conducted on Veritext's internet platform, defense counsel announced and attempted to display the files over her objection, and on January 13, 2026—after the state court's December 16, 2025 ruling that she "is not required to view" them—cued and paused a clip on the shared platform. Present were vendor reporters and videographers and, on November 21, 2025, an attendee connected under the email address of counsel for non-party CENTRAL ATLANTIC CONFERENCE (Veritext Job No. 7763844), none of whom signed the DCO undertaking (Paragraphs 71–76). As alleged in Paragraph 73, the files were staged on the vendor's platform ready for display, and, upon information and belief, Defendants transmitted or made them available to Veritext and its videographer; no vendor representative signed the DCO undertaking. Loading and cueing the files on that platform made them accessible to those persons within § 6851(a)(4) and, in the alternative, was an attempt to do so.

114. Knowledge and Reckless Disregard (§ 6851(b)(1)(A)): Each disclosure was made by persons who knew that JANE DOE had not consented: her counsel's written objections of December 27, 2023 and June 20, 2024, her May 22, 2025 written demand, and her objections on the deposition record ("I do not consent," Pl. Dep. Vol. III 333:18–24) preceded the disclosures they address (Paragraphs 68, 75, and 60). At a minimum, Defendants recklessly disregarded her nonconsent.

115. Exceptions Unavailable (§ 6851(b)(4)): The files are not commercial pornographic content (§ 6851(b)(4)(A)); no disclosure was made to law enforcement, for medical purposes, or in reporting unlawful content (§ 6851(b)(4)(B)(i), (iii)–(iv)); no disclosure concerned a matter of public concern (§ 6851(b)(4)(C)); and no disclosure was reasonably intended to assist her (§ 6851(b)(4)(D)). The legal-proceeding exception (§ 6851(b)(4)(B)(ii)) applies only to a disclosure "made in good faith," and these were not: (a) Defendants made a protective order their own precondition to handling the files, then disregarded the DCO's Paragraph 4 undertaking requirement for every vendor and attendee while her own forensic team complied (Paragraphs 69–74 and 64); (b) they shipped the files to her home after promising not to distribute them and over her written demand; (c) they paired the files with demands that she "[d]rop [her] case" (Paragraph 75); (d) after the state court ruled on December 16, 2025 that she "is not required to view" the videos, they cued a clip anyway and declared, "This deposition's over until you own the videos" (Paragraph 76); (e) they re-uploaded files to a repository without notice to her after earlier files were removed upon her objection (Paragraph 77); and (f) they withheld the source drive while disclosing processed copies whose integrity their own testimony contradicts (Paragraphs 64–65).

116. Injury: Defendants' disclosures caused JANE DOE humiliation, fear that the files would be further circulated, loss of privacy and control over material Defendants say depicts her,

distress at having unrequested material twice delivered to her residence, and the burden of turning to local police and a forensic examiner to protect herself and maintain a chain of custody.

117. Remedies (§ 6851(b)(3)): To the extent the files depict JANE DOE, as Defendants represent, she is entitled, for each disclosure, to her actual damages or, at her election, liquidated damages of $150,000, together with the cost of the action, including reasonable attorneys' fees and other litigation costs (§ 6851(b)(3)(A)(i)); to equitable relief, including temporary, preliminary, and permanent injunctions ordering Defendants to cease display or disclosure of the files, to deliver all originals, devices, and copies to a neutral custodian for sequestration and ultimate return or destruction, and to make no further disclosure except as a court expressly authorizes (§ 6851(b)(3)(A)(ii)); to confidentiality relief preserving her pseudonym (§ 6851(b)(3)(B)); and to punitive damages to the extent available under applicable law.

## NEW JERSEY STATE-LAW CLAIMS

### COUNT VI
### Human Trafficking
### N.J.S.A. 2C:13-8 and 2C:13-8.1
### (Against GONCI, BRIGHTON ASYLUM, and BRIGHTON STUDIOS LLC)

118. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

119. Elements: N.J.S.A. 2C:13-8.1 provides a civil action, without a criminal conviction, against the trafficker, those acting in concert, those knowingly receiving a pecuniary benefit, and those knowingly maintaining premises for trafficking. N.J.S.A. 2C:13-8(a)(1) reaches any sexual activity procured through prohibited means, whether or not value was exchanged.

120. From October 23, 2016 through September 2021, GONCI knowingly held, lured, enticed, harbored, transported, and obtained JANE DOE to engage in sexual activity through (a) serious bodily harm and physical restraint; (b) a scheme intended to make her believe she would

suffer serious harm, restraint, or ICE detention if she refused; (c) criminal coercion under N.J.S.A. 2C:13-5(a); (d) abuse and threatened abuse of legal process, including the cross-complaint he admitted rested on a characterization made only "[f]or the purposes of the TRO"; and (e) fraud (Paragraphs 39–49 and 75–76).

121. Causation and Injury: The trafficking proximately caused JANE DOE's cervical injuries and radiculopathy, bleeding, gynecological injury, and economic loss (Paragraph 81). Liability under N.J.S.A. 2C:13-8.1 does not require a criminal conviction and is proved by a preponderance of the evidence.

122. BRIGHTON ASYLUM and, for violations on and after November 7, 2016, BRIGHTON STUDIOS LLC acted in concert, knowingly received pecuniary benefits, and knowingly maintained the locked rooms with disabled cameras (Paragraphs 57 and 58–61). JANE DOE is entitled to damages for pain and suffering and medical expenses, punitive and additional statutory damages, equitable relief, and attorneys' fees under N.J.S.A. 2C:13-8.1.

**COUNT VII**
**Nonconsensual Creation and Unauthorized Disclosure of Sexually Explicit Recordings**
**N.J.S.A. 2A:58D-1(a)–(c); N.J.S.A. 2C:14-9(b)–(c)**
**(Against GONCI and BRIGHTON ASYLUM)**

123. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

124. Elements: N.J.S.A. 2A:58D-1(a) makes liable to the depicted person an actor who, in violation of N.J.S.A. 2C:14-9, "photographs, films, videotapes, records, or otherwise reproduces in any manner" the image of another person engaged in an act of sexual penetration or sexual contact or whose intimate parts are exposed; N.J.S.A. 2A:58D-1(b) makes liable an actor who, in violation of N.J.S.A. 2C:14-9, discloses any such reproduction. N.J.S.A. 2C:14-9(b) reaches one

who, knowing he is not licensed or privileged to do so, records such an image without the person's consent and under circumstances in which a reasonable person would not expect to be observed, and N.J.S.A. 2C:14-9(c) reaches one who, so knowing, discloses such an image without the person's consent. "Disclose" includes to "mail, deliver, transfer, publish, distribute, circulate, disseminate, present, exhibit, . . . share, or make available via the Internet or by any other means." N.J.S.A. 2A:58D-1(b)(1). Under N.J.S.A. 2A:58D-1(c), the court may award actual damages but not less than liquidated damages of $1,000 for each violation, punitive damages upon proof of willful or reckless disregard of the law, reasonable attorneys' fees and costs, and equitable relief; no criminal conviction is required.

125. Recording Without Consent in Circumstances of Privacy: JANE DOE knows from her own observation that in or about September 2017 she awoke at GONCI's residence to find him penetrating her while pointing a camcorder at her; when she objected and demanded the device, he said there was no tape and hid it (Paragraph 43). GONCI and BRIGHTON ASYLUM further represent that GONCI himself made twenty-eight video files and one image using his cellphone—the number BRIGHTON ASYLUM publishes as its business contact—and a Sony HDR-CX675 camcorder, including inside locked Escape Room 1408 and the storage unit, and transferred them to an external hard drive; GONCI could not identify any occasion on which he obtained her permission to record (Paragraph 63). A reasonable person would not expect to be observed in a locked room from which customers and staff were excluded and whose monitoring cameras GONCI testified were "shut off so that somebody else could not witness a private moment between you and I" (Paragraph 58), or in a private residence. To the extent the files depict JANE DOE, as Defendants represent, GONCI knowingly recorded her without license, privilege, or consent in violation of N.J.S.A. 2C:14-9(b), individually and, inside the Premises, as BRIGHTON ASYLUM's CEO using its rooms, locks, cameras, and business telephone.

126. Disclosure Without Consent: To the same extent, GONCI and BRIGHTON ASYLUM, knowing they were not licensed or privileged to do so and after her written objections, disclosed those images in 2025 and 2026 in violation of N.J.S.A. 2C:14-9(c)—by mailing and delivering them by FedEx, transferring excerpts, and presenting, exhibiting, and making them available on an internet deposition platform—as alleged in Paragraphs 70–72 and Count V. The litigation privilege does not protect disclosures made outside the DCO's conditions, after the court excused her from viewing, and paired with demands that she abandon her suit (Paragraphs 74–76). Each recording and each disclosure is a separate violation, and each was made in willful or reckless disregard of the law. JANE DOE is entitled to actual damages but not less than $1,000 per violation, punitive damages, reasonable attorneys' fees and costs, and equitable relief under N.J.S.A. 2A:58D-1(c). This Count is timely under N.J.S.A. 2A:14-2a(b)(1), because a violation of N.J.S.A. 2C:14-9 is a crime of a sexual nature, and because JANE DOE did not learn until December 12, 2023 that GONCI claimed to hold the files (Paragraphs 63 and 84); every disclosure occurred within two years of filing.

**COUNT VIII**
**Intrusion Upon Seclusion**
**New Jersey Common Law**
**(Against GONCI and BRIGHTON ASYLUM)**

127. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

128. Elements: One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs or concerns is liable if the intrusion would be highly offensive to a reasonable person; publication is not required. GONCI, individually and through BRIGHTON ASYLUM's rooms, cameras, and business telephone, intentionally

intruded upon JANE DOE's seclusion in the following separate ways, each highly offensive to a reasonable person:

(a) Covert Recording in Private Settings: in or about September 2017, pointing a camcorder at her during sexual penetration after she had lost consciousness, then lying that there was no tape and hiding the device (Paragraph 43); and, to the extent the files depict her, as Defendants represent, recording her body and sexual acts without consent inside a locked room whose cameras he had shut off so that no one could "witness a private moment," and in private residences (Paragraphs 58 and 63);

(b) The April 19, 2021 Recording: secretly recording their private conversation after she asked whether he was recording and he said no (Paragraph 48);

(c) Forced-Viewing Demands: on November 19 and 21, 2025 and January 13, 2026—after her written objections and, on January 13, after the state court ruled she was not required to view the files—repeatedly demanding, through counsel, that she watch files Defendants call "prurient" or end her deposition, and cueing a clip before non-parties who had signed nothing (Paragraphs 71–76); and

(d) Immigration and Identification Records: directing the October 6, 2025 ICE subpoena at her confidential immigration file and acquiring and continuing to retain her unredacted immigration and identification documents over her written demands (Paragraphs 79–80).

129. Timeliness and Damages: The intrusions in subparagraphs (c) and (d) occurred within two years of filing. The intrusions in subparagraph (a) are timely under N.J.S.A. 2A:14-2a(b)(1) as injuries resulting from a crime of a sexual nature, and, under the discovery rule, because JANE DOE did not learn until December 12, 2023 that GONCI claimed to hold the files (Paragraphs 63 and 84); Defendants' continuing retention and 2025–2026 use of those files

continue the intrusion. Subparagraph (b) is alleged as part of the same course of conduct. JANE DOE is entitled to compensatory and punitive damages and equitable relief.

**COUNT IX**
**Gross Negligence: Retention, Supervision, Assignment, and Failure to Warn**
**New Jersey Common Law; N.J.S.A. 2A:53A-7(c)(1)**
**(Against MORSEMERE COMMUNITY CHURCH)**

130. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

131. Duty: In 2016, MORSEMERE COMMUNITY CHURCH employed GONCI, included him on its Council, controlled his secular assignments and access to congregants, had actual Council knowledge of his 2001 arrest and the specific risk it revealed, knew through Rev. Kim of JANE DOE's cachexia, psychiatric disability, ICE supervision, and inability to drive, and affirmatively undertook her transportation home from worship (Paragraphs 32–34; Restatement (Second) of Torts §§ 302B, 317, 323).

132. Gross Negligence and Causation: In extreme departure from ordinary care and with reckless indifference to a known risk, MORSEMERE COMMUNITY CHURCH (a) imposed no restriction on GONCI's one-on-one contact with or transport of vulnerable congregants after voting to retain him; (b) failed to inform Rev. Kim of the 2001 investigation or allowed her to assign GONCI despite it; (c) gave JANE DOE and her mother no warning; and (d) assigned GONCI to drive her home alone week after week from June through October 23, 2016 and on November 20, 2016, with no chaperone, second rider, or check-in (Paragraphs 34–35). That assignment placed GONCI in control of the very rides he diverted (Paragraphs 39–40), proximately causing JANE DOE's injuries. MORSEMERE COMMUNITY CHURCH's knowledge and notice at each stage are alleged in Paragraph 54; any loss of its 2001 investigation

and retention records after its preservation duty arose warrants an adverse inference (Paragraph 56).

133. Proximate Cause and Foreseeability: Sexual exploitation of a frail, disabled congregant left alone with a staff member whose Council had investigated him for isolating and kissing a child during a music engagement was the very risk that made the assignment grossly negligent; the October 23 and November 20, 2016 motel diversions occurred during the church-arranged rides (Paragraphs 39–40), and the trafficking that followed flowed from the access those rides created (Paragraphs 41–49).

134. Charitable Immunity Inapplicable; Timeliness: Charitable immunity does not apply because N.J.S.A. 2A:53A-7(c)(1) withholds it from a nonprofit whose willful, wanton, or grossly negligent act or omission, including sexual assault and other crimes of a sexual nature, causes injury. MORSEMERE COMMUNITY CHURCH's later conduct—Rev. Kim's April 21, 2023 text fearing "serious trouble if anyone at church finds out" how GONCI left the church, her statement that a person who is not a U.S. citizen could not sue, and its November 2025 joinder in the motion to quash her subpoenas for the 2001 records—reflects consciousness of the risk and concealment. JANE DOE did not discover the Council's investigation and retention vote until June 4, 2023, and this Count is timely as alleged in Paragraph 84; the later conduct is also alleged in Paragraph 53. She is entitled to compensatory and, where authorized, punitive damages.

**COUNT X**
**Gross Negligence, Delegated Safe-Church Undertaking, and Vicarious Liability**
**New Jersey Common Law; N.J.S.A. 2A:53A-7(c)(1)**
**(Against CENTRAL ATLANTIC CONFERENCE)**

135. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

136. Duty: Before and throughout 2016, CENTRAL ATLANTIC CONFERENCE, through its New Jersey Association, processed MORSEMERE COMMUNITY CHURCH's pastoral placement profile, installed its own sitting Director, Rev. Kim, as Pastor on May 1, 2016, and held out its New Jersey office as the channel through which congregational safety concerns were to be raised, thereby undertaking secular, administrative congregant-protection responsibilities toward the congregation (Paragraphs 21 and 36; Restatement (Second) of Torts § 324A). JANE DOE asks the Court to review no determination of ministerial standing, fitness, or doctrine.

137. Knowledge, Breach, and Causation: Rev. Kim's 2016 knowledge of JANE DOE's condition and of the ride assignment was acquired within the scope of her dual role as installed pastor and sitting Conference Director and is imputed to CENTRAL ATLANTIC CONFERENCE. CENTRAL ATLANTIC CONFERENCE breached its duties with gross negligence in 2016, directly and vicariously through Rev. Kim, by failing to require a chaperone, warning, or restriction before its Director placed a 65-pound disabled congregant alone in GONCI's car from June through November 2016 (Paragraph 36). Either it learned of the 2001 arrest and retention vote during placement vetting, as its Associate Conference Minister's 2023 knowledge suggests, or it acted with gross negligence in installing its Director at that church without inquiring into staff sexual-safety history. Those pre-injury breaches enabled the October 23 and November 20, 2016 motel diversions and the trafficking that followed. CENTRAL ATLANTIC CONFERENCE's knowledge and notice are further alleged in Paragraph 55; any loss of its placement, installation, and safe-church records after its preservation duty arose warrants an adverse inference (Paragraph 56).

138. Vicarious Liability: CENTRAL ATLANTIC CONFERENCE is also vicariously liable for Rev. Kim's 2016 acts and omissions as its sitting Director and installed pastor, because

the ride assignment and the failure to warn or impose safeguards occurred within the scope of the congregant-care responsibilities it entrusted to her (Paragraphs 34, 36, and 55).

139. Charitable Immunity Inapplicable; Later Conduct: N.J.S.A. 2A:53A-7(c)(1) withholds charitable immunity for willful, wanton, or grossly negligent acts or omissions causing injury, including sexual assault and other crimes of a sexual nature. CENTRAL ATLANTIC CONFERENCE's representative's August 2023 defense of the retention decision and discouragement of suit, and its November 12, 2025 motion to quash her subpoenas for the 2001 records (Paragraphs 53 and 55), reflect consciousness of the risk and concealment. This Count is timely as alleged in Paragraph 84. JANE DOE is entitled to compensatory and, where authorized, punitive damages.

**COUNT XI**
**Negligent Operation and Control of the Premises (in the Alternative)**
**New Jersey Common Law**
**(Against BRIGHTON ASYLUM and BRIGHTON STUDIOS LLC)**

140. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

141. In the alternative to Counts II through IV and VI, BRIGHTON ASYLUM, as operator in control of the Premises, and BRIGHTON STUDIOS, as owner and lessor retaining entry and inspection rights under leases prohibiting "personal activities," owed JANE DOE, a permitted entrant, a duty of reasonable care to supervise their commercial rooms and prevent the foreseeable disabling of security cameras and use of locked rooms for sexual assault. They breached that duty by permitting Escape Room 1408 and the storage unit to be locked from within and stripped of camera monitoring for coerced sexual encounters from 2016 through 2021 (Paragraphs 58–61), proximately causing her injuries on the Premises. BRIGHTON STUDIOS' notice of those conditions is alleged in Paragraphs 61 and 62.

142. Elements Applied: (a) duty—BRIGHTON ASYLUM controlled the rooms, locks, and cameras, and BRIGHTON STUDIOS reserved entry, inspection, and maintenance rights (Paragraphs 58 and 62); (b) breach—the rooms were repeatedly locked from inside with cameras disabled while a visibly emaciated, disabled woman was escorted past customers (Paragraph 61); (c) causation and damages—those conditions enabled the coerced sexual encounters on the Premises and the injuries alleged in Paragraph 81. This Count is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2) and is timely as alleged in Paragraph 84.

**COUNT XII**
**Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing**
**New Jersey Common Law**
**(Against GONCI)**

143. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

144. Contract and Breach: The Agreement is a valid contract supported by the reciprocal dismissal of the parties' cross-complaints, which JANE DOE fully performed (Paragraph 50). Paragraph 3 was negotiated to neutralize GONCI's immigration threats and contains no litigation exception. GONCI materially breached Paragraph 3 on October 6, 2025 by causing his agent to subpoena her ICE file (Paragraph 79). Alternatively, he breached the implied covenant of good faith and fair dealing by using a subpoena to accomplish the contact Paragraph 3 forbids and by obtaining, retaining, and refusing to return or account for her unredacted immigration and identification documents (Paragraph 80), depriving her of the Agreement's core benefit.

145. Elements Applied: (a) a valid contract—the written Agreement signed by both parties and their counsel (Paragraph 50); (b) JANE DOE's performance—dismissal of her complaint; (c) breach—the October 6, 2025 ICE subpoena served by his agent on his behalf

(Paragraph 79); and (d) resulting damages—relocation, incremental housing and living, and mitigation expenses (Paragraphs 79 and 81).

146. Causation and Remedies: The breach foreseeably caused her relocation, incremental housing and living, and mitigation expenses (Paragraph 79). JANE DOE is entitled to consequential and nominal damages, specific performance of Paragraph 3, and injunctive relief.

**COUNT XIII**
**Unlawful Acquisition and Retention of Immigration and Identification Documents; Conversion, Replevin, and Invasion of Privacy**
**18 U.S.C. §§ 1592(a), 1595(a); N.J.S.A. 2C:13-8(a)(1)(d), 2C:13-8.1; New Jersey Common Law**
**(Against GONCI and the Doe Defendants)**

147. JANE DOE incorporates Paragraphs 1 through 84, including each lettered subparagraph, as though fully set forth herein.

148. JANE DOE holds an exclusive possessory and privacy interest in the unredacted copies of her immigration and identification documents that her former clinic produced in error on May 19 and 27, 2026, outside the scope of a therapy-records subpoena. GONCI and the Doe Defendants have exercised dominion over those copies, designated her own documents "For Attorney's Eyes Only," and refused her written demands of May 24, May 29, and June 4, 2026 for return, certified destruction, or neutral sequestration, and refused to state whether GONCI holds copies or what ICE produced (Paragraphs 79–80).

149. Statutory Theory (Pleaded in the Alternative): Section 1592(a) prohibits knowingly possessing another person's immigration or government identification document in the course of a violation of chapter 77, and N.J.S.A. 2C:13-8(a)(1)(d) treats possession of a victim's immigration or government identification documents as a means of trafficking. Defendants acquired the documents of the victim of the venture pleaded in Count I through process in the litigation that venture produced and retain them, together with the October 6, 2025 ICE subpoena and the

contemporaneous demands that she view the files or drop her claims (Paragraphs 75–76), as a continuing instrument of the coercion pleaded in Counts I and XII.

150. Elements of Conversion and Replevin Applied: (a) JANE DOE's right to possession and control of the unredacted copies of her own documents, produced without her authorization and in error; (b) Defendants' exercise of dominion inconsistent with that right by retaining and designating them; (c) her written demands for return of May 24, May 29, and June 4, 2026; and (d) Defendants' refusal (Paragraph 80).

151. Common Law: Defendants' unauthorized retention of, and dominion over, those copies in defiance of her written demands constitutes conversion, supports replevin, and is an ongoing invasion of privacy, entitling JANE DOE to compensatory and punitive damages, replevin, a sworn accounting under seal, and injunctive relief compelling the return or certified destruction of all unredacted copies.

**PRAYER FOR RELIEF**

WHEREFORE, JANE DOE requests that the Court enter judgment in her favor against each Defendant liable on each Count, jointly and severally where the law permits, and award:

A. Compensatory and consequential damages according to proof, including past and future medical and care expenses for her physical injuries and illness; consequential relocation and living expenses incurred since October 2025; other economic loss; physical pain, impairment, and illness, including cervical spine disc herniations, bilateral cervical radiculopathy, chronic headaches, uterine bleeding, persistent high-risk HPV infection, herpes, and continuing gynecological procedures; emotional distress resulting from those physical injuries and illness; and, on the privacy, recording, and document claims, emotional distress, humiliation, and loss of privacy; without duplicate recovery;

B. On Counts I through IV (against GONCI, BRIGHTON ASYLUM, and BRIGHTON STUDIOS LLC), compensatory damages, punitive damages, and reasonable attorneys' fees and costs under 18 U.S.C. § 1595(a);

C. On Count V (against GONCI, BRIGHTON ASYLUM, and the Doe Defendants), actual damages or statutory liquidated damages in the amount of $150,000 as authorized by 15 U.S.C. § 6851(b)(3)(A)(i), without duplicate recovery, together with punitive damages, costs, and reasonable attorneys' fees;

D. On Count VI (against GONCI, BRIGHTON ASYLUM, and BRIGHTON STUDIOS LLC), damages for pain and suffering, reasonable costs of necessary medical and dental services, punitive damages, the mandatory additional statutory damages required by N.J.S.A. 2C:13-8.1(c)(1)–(2), and reasonable attorneys' fees and costs under N.J.S.A. 2C:13-8.1(d);

E. On Count VII (against GONCI and BRIGHTON ASYLUM), actual damages but not less than $1,000 for each separate creation and disclosure violation, punitive damages, and reasonable attorneys' fees and costs under N.J.S.A. 2A:58D-1(c);

F. On Counts VIII, IX, X, and XI, compensatory damages, punitive damages where authorized by law (including under N.J.S.A. 2A:53A-7(c)(1)), and costs of suit;

G. Preliminary and permanent injunctive relief, to the extent warranted against parties over whom this Court has jurisdiction, (i) requiring delivery of all original recording devices, external drives, memory cards, native files, and copies of files Defendants represent depict JANE DOE to a neutral forensic custodian for secure imaging and sequestration; (ii) preserving all metadata, transfer and download histories, sharing permissions, audit logs, vendor communications, and signed agreements to be bound, including for Veritext, Dropbox, SharePoint, and deposition-presentation platforms; (iii) requiring that any open link to such material be immediately disabled; (iv) requiring Defendants to provide under seal a verified accounting of every person, vendor, repository, and link to which any such file, or any index of such files, has been transferred, displayed, or made accessible since December 12, 2023, with applicable confidentiality undertakings and current retention or deletion status; and (v) prohibiting further unauthorized distribution, subject to any procedure the state court directs for its own litigation;

H. On Counts XII and XIII, specific performance of Paragraph 3 of the October 2021 Agreement, replevin, and preliminary and permanent injunctive relief (i) prohibiting GONCI, the Doe Defendants, and anyone acting for them or in concert with them from contacting the Department of Homeland Security, including ICE, regarding JANE DOE's immigration status, and from transmitting her immigration or identification documents to it or any third party, subject to any disclosure expressly required by statute or federal court order; (ii) requiring a sworn accounting under seal disclosing whether ICE produced any records or communications in response to the October 6, 2025 subpoena, delivering any such records and all copies to the Court under seal or to a neutral custodian, and identifying every person who has viewed, received, or accessed the unredacted documents since May 19, 2026; and (iii) requiring the immediate return or certified destruction of all unredacted copies of her immigration and identification documents, except any single copy the Court directs be sequestered; together with consequential, nominal, and punitive damages;

I. Leave to proceed under a pseudonym and orders maintaining the confidentiality of her identity, residential address, and the sexually explicit material under 15 U.S.C. § 6851(b)(3)(B) and the applicable rules; and

J. Costs, pre- and post-judgment interest, and such other relief as the Court deems just.

The protective relief requested permits preservation of evidence, access through the custodian for use in the State Action as the state court directs, and any other use this Court specifically authorizes. JANE DOE does not ask this Court to stay, review, or interfere with proceedings in the State Action.

**JURY DEMAND**

Under Federal Rule of Civil Procedure 38 and L. Civ. R. 38.1, JANE DOE demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Jane Doe

______________________________

Jane Doe
P.O. Box 2005
River Vale, New Jersey 07675
201-922-8120
janedoefederal0@gmail.com
Dated: October 23, 2026

**CERTIFICATION OF RELATED ACTION**
**L. Civ. R. 11.2 and 28 U.S.C. § 1746**

I am the Plaintiff. Under my true name, I am also the plaintiff in a pending Superior Court of New Jersey, Law Division, Bergen County action identified in my concurrently filed Sealed Certification of Related State Court Action. That action names Richard A. Gonci, Jr. and ScarEntertainment LLC d/b/a Brighton Asylum as defendants. Its operative pleading includes assault-and-battery allegations directed at a specified August 28, 2021 incident, alongside other state tort theories; defendants have filed a malicious-abuse-of-process counterclaim. The State Action is scheduled for trial (date stated in the sealed certification). The state court denied a motion to add trafficking and recording causes of action on December 16, 2025 and May 11, 2026 after defendants opposed the amendments, including on relation-back grounds. This federal action alleges a broader course of federal and state trafficking and recording conduct, additional institutional and corporate defendants (Brighton Studios LLC, Morsemere Community Church, and Central Atlantic Conference of the United Church of Christ, Inc.), later 2025–2026 disclosures, and an October 2025 breach of contract and May 2026 retention of immigration credentials. I identify the related case and material overlap without suggesting that the state court adjudicated the claims asserted here on their merits or that I seek duplicate recovery.

Because the state-court caption and my true name appear on the public state docket, I file under seal a separate Sealed Certification of Related State Court Action that states the full caption, Superior Court docket number, scheduled trial date, date commenced, and the names and roles of all parties. This public certification does not repeat that identifying information. I request that the sealed certification be maintained under restriction consistent with my pseudonym and sealing applications.

Subject to that submission, I am not aware of any other pending action, arbitration, or administrative proceeding concerning the matter in controversy, and I am not aware of any other party who should be joined. I will supplement this certification if that changes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 23, 2026.

/s/ Jane Doe

Jane Doe (pseudonym requested)

**CERTIFICATION REGARDING ARBITRATION**
**L. Civ. R. 201.1**

I certify that this action seeks preliminary and permanent injunctive relief in addition to money damages and therefore does not seek only the money damages described in L. Civ. R. 201.1(d)(1). I also allege that the compensatory and statutory damages sought exceed $150,000, exclusive of interest, costs, and any claim for punitive damages.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 23, 2026.

/s/ Jane Doe

Jane Doe (pseudonym requested)